In the Missouri Court of Appeals
 Western District

MATTHEW R. ROSCHE, )
 Respondent, ) WD84073
v. )
 )
DIRECTOR OF REVENUE, ) FILED: July 6, 2021
 Appellant. )

 APPEAL FROM THE CIRCUIT COURT OF BUCHANAN COUNTY
 THE HONORABLE DANIEL F. KELLOGG, JUDGE

 BEFORE DIVISION FOUR: CYNTHIA L. MARTIN, CHIEF JUDGE, PRESIDING,
 LISA WHITE HARDWICK AND THOMAS N. CHAPMAN, JUDGES

 The Director of Revenue (“the Director”) appeals from the judgment setting

aside the suspension of Matthew Rosche’s driving privilege. The Director

contends the circuit court erred in finding that there was an insufficient foundation

for the admission of Rosche’s breath analyzer test result. Because Rosche’s

breath analyzer test result was admissible, we reverse.

 FACTUAL AND PROCEDURAL HISTORY

 On December 9, 2017, Corporal Robert Dudeck of the Missouri State

Highway Patrol arrested Rosche on probable cause to believe he had been driving
while intoxicated.1 At the time of the arrest, Dudeck was a Type III permit holder,

which allowed him to operate a breath alcohol test instrument. Dudeck used an

Intox DMT breath analyzer to collect a breath sample from Rosche. Dudeck

certified in his Alcohol Influence Report that he did not deviate from approved

procedures, that the instrument was functioning properly, and that no radio

transmission occurred inside the room during the test. The sample of Rosche’s

breath yielded a blood alcohol concentration (“BAC”) of .086%.

 Four days before Rosche’s arrest, on December 5, 2017, Trooper Steven

Force, with the Missouri State Highway Patrol, performed a maintenance test on

the breath analyzer. Force was a Type II permit holder, which allowed him to run

maintenance tests on the breath analyzer instrument. Force used a compressed

ethanol-gas mixture, which his maintenance report stated was supplied by

“Intoximeters,” to conduct the calibration check. The ethanol-gas mixture came

with a certificate of analysis. This certificate stated that it was from “Airgas USA

LLC” to “Exclusive Supplier, Intoximeters, Inc., 2081 Craig Road, St. Louis, MO

63146 .” Force also conducted a radio frequency interference (“RFI”) test during

his maintenance check. He noted that the RFI detector on the breath analyzer was

functioning properly.

 Due to his having a BAC of over .08%, Rosche’s driving privilege was

suspended pursuant to Section 302.505.1.2 He petitioned for a trial de novo. At

1
 Probable cause to believe Rosche had been driving while intoxicated is not at issue in this appeal.
2
 All statutory references are to the Revised Statutes of Missouri 2016.

 2
trial, Rosche objected to the breath analyzer test result, arguing that 19 CSR 25-

30.051(6), the regulation that prescribed breath analyzer calibration and accuracy

verification standards, listed “Intoximeters, Inc. St Louis, MO 63114,” as an

approved supplier of standard compressed ethanol-gas mixtures. Because the

certificate of analysis for this machine listed Intoximeters, Inc.’s zip code as 63146

and not 63114, Rosche argued the test result was inadmissible. Rosche also

extensively questioned Dudeck and Force, both of whom testified on behalf of the

Director, on whether RFI may have occurred during Rosche’s breath analyzer test

and affected the accuracy of the result.

 In its judgment, the circuit court expressly found that the Director’s

evidence was credible. The court, however, found that there was an insufficient

foundation for the admission of Rosche’s BAC test result due to the “use of the

wrong testing supplies for the instrument” and “radio interference.” Therefore,

the court set aside the suspension of Rosche’s driving privilege. The Director

appeals.

 STANDARD OF REVIEW

 We review the circuit court’s judgment reinstating driving privileges like

any other court-tried case. Schwandner v. Dir. of Revenue, 616 S.W.3d 534, 536

(Mo. App. 2021). Accordingly, we will affirm the judgment unless there is no

substantial evidence to support it, it is against the weight of the evidence, or it

erroneously declares or applies the law. Id. We defer to the circuit court’s

 3
credibility determinations on disputed factual issues. Id. When facts are not

contested and the issue is one of law, however, our review is de novo. Id.

 ANALYSIS

 To suspend driving privileges, the Director has the burden of proving, by a

preponderance of the evidence, that the officer had probable cause for arresting

the driver for an alcohol-related offense and that the driver’s BAC exceeded the

legal limit of .08 percent. Id. To prove that the driver’s BAC exceeded the legal

limit, the Director may introduce the result of a breath analyzer test. Id. To lay a

foundation for admission of the result, “the Director must establish that the test

was performed using the approved techniques and methods of the Department of

Health and Senior Services [(“the Department”)], by an operator holding a valid

permit and on equipment and devices approved by the Department.” Id. (citation

omitted).

 “The Department has promulgated regulations pertaining to the

maintenance of breath analyzer machines that must be followed in order for the

results taken from a particular machine to be admissible at trial.” Id. at 536-37.

Specifically, the regulations provide, in pertinent part, that “[c]ompressed ethanol-

gas standard mixtures used to verify and calibrate breath analyzers shall be

mixtures provided from approved suppliers.” Id. at 537 (quoting 19 CSR 25-

30.051(5)). The regulations then list “approved suppliers of standard compressed

ethanol-gas mixtures.” Id. (quoting 19 CSR 25-30.051(6)). “Intoximeters, Inc. St.

Louis, MO 63114” is listed as one of the approved suppliers in the regulations. Id.

 4
 In Point I, the Director contends the circuit court erred in excluding the

breath test result due to its finding of the “use of the wrong testing supplies for

the instrument.” The court’s finding was apparently based upon the discrepancy

between the zip code listed for “Intoximeters, Inc., St. Louis MO 63146” on Force’s

breath analyzer maintenance report and the zip code listed for “Intoximeters, Inc.

St. Louis MO 63114” in 19 CSR 25-30.051(6)’s list of approved suppliers of

standard compressed ethanol-gas mixtures.

 The Eastern District of this court recently addressed this exact issue,

holding:

 (1) the Director’s evidence in this case identifying “Intoximeters, Inc.”
 as the supplier of the standard compressed ethanol-gas standard
 mixture used to maintain the Breath Analyzer machine used by Driver
 was sufficient to establish the mixture came from an approved
 supplier under 19 CSR 25-30.051(6); and (2) it is not necessary to
 prove a company such as Intoximeters, Inc. has a particular zip code
 in order to show the company is an approved supplier of standard
 compressed ethanol-gas mixtures under 19 CSR 25-30.051(6). To
 hold otherwise would necessarily support the absurd and
 unreasonable conclusion that the Department’s regulations would
 have to be rewritten every time an approved supplier moved its place
 of business to a different zip code.

Id. at 538.3 We agree with the reasoning in Schwandner and apply it in this case.

Consequently, the circuit court erred in finding there was an insufficient

foundation for the admission of Rosche’s breath analyzer test result due to the

“use of the wrong testing supplies for the instrument.” Point I is granted.

3
 We note that 19 CSR 30.051(6) was amended in 2020 to delete the cities, states, and zip codes of
approved suppliers.

 5
 In Point II, the Director contends that the circuit court erred in excluding the

breath test result based on “radio interference.” The Director argues that the

court misapplied the law because Force’s testimony, which the court found

credible, established that the accuracy of the test was not impaired by RFI.

 Dudeck testified about possible RFI during his administration of Rosche’s

breath analyzer test. As he had indicated on his Alcohol Influence Report, Dudeck

testified that no radio transmissions occurred inside the room where and when

the test was being conducted.

 On cross-examination, Dudeck admitted that, while he was administering

Rosche’s breath analyzer test, he was wearing his wireless body microphone and

that he did not know whether the microphone was a radio or blue tooth device.

While Dudeck has the ability to shut off the microphone, he testified that he does

not “typically shut it off until the end of my shift.” Thus, Dudeck admitted that, if

he had his microphone on his person and it was turned on, it would have been

turned on for the entire time that he was in the breath testing room with Rosche.

Rosche’s counsel and Dudeck then had the following exchange:

 Q. And if it worked off of radio frequencies and it was transmitting
 back to your car, then it could have possibly been creating radio
 frequency transmissions while you were in the breath testing room,
 right?

 A. I’m not sure how it technically works, but my understanding is
 it’s only communicating a signal when my camera in the car is on
 and that was shut off prior to entering the jail.

 6
 Q. Okay. So you’re positive that your dash camera was shut off
 prior to entering the jail, the sally port? What do you mean by “the
 jail”? Do you mean the entire building?

 A. Correct.

 Q. So we shouldn’t see any dash cam footage of the sally port,
 then?

 A. If I shut it off inside the sally port, it’s going to show at least 30
 seconds afterwards, is the way our camera system works.

 Q. Okay. So if we watch the video and it shows 20 minutes after
 you pull up in the sally port, then we may have a possible problem,
 right?

 A. I suppose so. I’m not sure how it technically works, like I said.

 Q. And to the best of your knowledge, you don’t know if the video
 was shut off or not shut off, correct?

 A. I haven’t seen the video, because like I explained in the
 deposition, once they’re in our system, in our computer for a year,
 they get transmitted to Jefferson City, so I wouldn’t be able to watch
 a full video. So I’m not sure if it was shut off or not. I typically try to,
 but sometimes it’s maybe not done. I’m not sure.

 On redirect, the Director asked Dudeck whether he knew what would

happen to the instrument if it detected RFI. Dudeck replied, “It should give you

some sort of clue, the fact that something happened.” Dudeck testified that there

was no indication in this case that RFI interfered with the breath test and that he

“would assume” that, if RFI had interfered with the instrument, “some kind of

print-off or indication would have signaled that.”

 On recross, Rosche’s counsel again questioned Dudeck about the wireless

body microphone he was wearing and again elicited from Dudeck that his body

 7
microphone was hooked up wirelessly to the video system in his patrol car; that

his patrol car was sitting in the sally port at the Buchanan County Jail; and that, if

the video system in his patrol car was working and Dudeck was still wearing his

body microphone, it was “possible” that “there would be some sort of

transmission from [his] body mic back to the car where the video equipment is.”

Dudeck repeated that he was not sure “what type of transmission that is,”

specifically, he did not know whether the transmission is “blue tooth, radio, or

any sort of other way that one unit talks to the other without having a wire in

between.”

 Evidence about possible RFI during Rosche’s breath analyzer test also

included Force’s written maintenance report indicating that, four days before

Rosche’s arrest, Force performed an RFI test on the breath analyzer instrument. In

his trial testimony, Force explained how he conducted the RFI test, stated that he

did not deviate from any procedures approved by the Department in performing

the test, and testified that, in his opinion, “the instrument was functioning

properly as far as the RFI check was concerned.” Force further explained that, if

RFI is detected during a breath analyzer test, the instrument will terminate the

test, and the operator will have to start over. According to Force, “[a] valid breath

test, a successful breath test cannot be obtained if radio frequency interference

was present at the time of the test.”

 On cross-examination, Force admitted that he did not know what level of

RFI was required to trigger the error code in the Intox DMT breath analyzer

 8
instrument used to conduct Rosche’s test but that he knew “that the instrument is

pretty sensitive.” Rosche’s counsel then asked Force:

 So, I mean, you can’t sit here today and say that there was no RFI in
 that room, as much as you can sit here and say, Well, the machine
 didn’t detect any RFI. The maker of the machine programs it, sets a
 level that the machine is – you know, the maker is concerned about,
 and unless that error code pops up, we assume everything is okay.

In response, Force testified, “I could say that no radio frequency interference to

the level programmed into the instrument was present that day during the test.”

 At the end of the trial, Rosche’s counsel offered into evidence the video

from Dudeck’s patrol car that was recorded while the car was parked in the sally

port. According to Rosche’s counsel, the video was “about 30 minutes” long.

The court admitted the video and informed counsel that it would watch the video

before entering its judgment.

 On appeal, the Director argues that, because the court found the Director’s

evidence credible, and this evidence established (1) that the instrument had a

functioning RFI detector, (2) that the instrument would not produce a result if RFI

were detected, and (3) that no RFI above the instrument’s detection threshold

occurred, the only possible basis for the court’s exclusion of Rosche’s breath

analyzer test result due to “radio interference” was because the court believed

that the Director had some additional obligation to establish that Dudeck’s

microphone did not produce some form of RFI that was undetectable by the

instrument.

 9
 We agree with the Director that he did not have this additional obligation.

Rather, the Director was required to establish only that Dudeck, a valid permit

holder, administered the test on a Department-approved device and followed the

Department’s approved techniques and methods in doing so. Id. at 536. The

Director met this burden through (1) Force’s testimony that, after performing

maintenance and checks on the instrument using the Department’s approved

procedures, he believed that the instrument had a functioning RFI detector of

sufficient sensitivity to detect RFI and to terminate any test during which RFI is

detected, and (2) Dudeck’s testimony that the RFI detector was not triggered

during Rosche’s test. The court expressly found this evidence credible. Evidence

that the RFI detector did not indicate any interference with the breath analyzer test

constituted “clear evidence” that the accuracy of the test was not compromised

by the use of Dudeck’s body microphone while the test was being administered.

See State v. Mack, 903 S.W.2d 623, 630 (Mo. App. 1995), superseded by statute on

other grounds as recognized by State v. Anders, 975 S.W.2d 462, 465 (Mo. App.

1998) (holding that testimony from the officer who administered the breath

analyzer test that the RFI detector never indicated any interference with the

appellant’s test constituted “clear evidence” that the test was not compromised

by the use of cell phones while the test was being administered). Thus, even if

the court believed that Dudeck’s body microphone created some RFI during

Rosche’s test, and we defer to the court’s decision to make that factual inference,

that inference alone was not a sufficient basis upon which to exclude the test

 10
result in light of the “clear evidence” that any such RFI did not compromise the

accuracy of the breath analyzer test. The circuit court erred in finding there was

an insufficient foundation for the admission of Rosche’s breath analyzer test result

due to “radio interference.” Point II is granted.

 CONCLUSION

 The judgment setting aside the suspension of Rosche’s driving privilege is

reversed.

 LISA WHITE HARDWICK, JUDGE

All concur.

 11